UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 3:24-cr-00189 |
| v. ) | JUDGE CRENSHAW |
| ) | |
| DAVID AARON BLOYED ) | |

## MOTION TO REVOKE ORDER OF DETENTION

David Aaron Bloyed, through counsel and pursuant to 18 U.S.C. § 3145(b), asks this Court to docket this motion for oral argument. He submits the detention hearing transcript and pretrial services report for the Court's consideration. He further asks that, at the conclusion of the hearing, the Court revoke the previous order of detention and allow him to be released with conditions pending trial.

### Procedural History

On September 13, 2024, Magistrate Judge Frensley issued a complaint in Case No. 24-mj-2272 charging Mr. Bloyed with a violation of 18 U.S.C. § 875(c). The affidavit in support of the complaint alleged that, on July 19, 2024, Mr. Bloyed made a social media post stating "that he intended to, along with others, lynch and kill Glenn Funk, the District Attorney for Nashville and Davidson County, Tennessee." On September 18, the Government filed a motion for detention. On September 19, Mr. Bloyed was arrested in connection with that complaint in the Northern District of Texas. On September 20, Magistrate Judge Frensley issued a second complaint in Case No. 24-mj-2295, again charging Mr. Bloyed with a violation of 18 U.S.C. § 875(c).

1

The affidavit in support of the second complaint makes the same basic allegations against Mr. Bloyed with a somewhat different statement of facts.

On September 25, the U.S. District Court for the Northern District of Texas held an identity hearing, preliminary hearing, and detention hearing in connection with the original September 13 complaint. At the conclusion of the hearing, Magistrate Judge Brian McKay found that Mr. Bloyed was the same person named in the arrest warrant and that there was probable cause to believe that Mr. Bloyed had violated 18 U.S.C. § 875(c). He also found that, although Mr. Bloyed did not pose a risk of flight, the Government had shown by clear and convincing evidence that there was no condition or combination of conditions that would reasonably assure the safety of any other person and the community.

On October 16, the grand jury issued an indictment charging Mr. Bloyed with a violation of 18 U.S.C. 875(c). On October 17, this Court conducted an initial appearance in Case No. 24-mj-2295. On October 31, this Court held an arraignment in this case. On November 2, this Court entered an order setting the case for jury trial on January 7, 2025. On November 8, this Court entered an order resetting the jury trial to December 17, 2024.

## Facts

I. **Pretrial Services Report**

On September 24, 2024, the U.S. Probation Office for the Northern District of Texas prepared a pretrial services report for Mr. Bloyed recommending that Mr. Bloyed be released on recognizance with the following conditions:

2

1. Report to pretrial services.

2. Travel is restricted to the Northern District of Texas, unless approved in advance by the United States Probation Office.

3. Surrender any passport(s).

4. No contact with any victim(s) or witness(es).

5. Do not apply for a new passport(s).

6. Report as soon as possible to the supervising officer any contact with any law enforcement personnel, including, but not limited to, any arrest, questioning, or traffic stop.

7. Not possess a firearm, destructive device, or other weapon.

8. Refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. 802, unless prescribed by a licensed medical practitioner.

The report provided that his prior criminal history is limited to a single criminal trespass charge from Corsicana, Texas in November 2023. Probation interviewed Mr. Bloyed's wife Rebecca Bloyed, who provided the following information:

> The defendant, age 59, was born on March 7, 1965, in Dallas, Texas, to Walter and Wanda Bloyed. The defendant has resided in Texas his entire life. The defendant's wife [Rebecca Bloyed] advised they have lived at the above noted address since approximately 2020. Mrs. Bloyed clarified their home is located on her father-in-law's property, and the mother resides in Weatherford, Texas, with his half-sister.
>
> The defendant has been married to Mrs. Bloyed for approximately 24 years, and one child was born of this union: Eric Bloyed (age 15).
>
> Mrs. Bloyed advised her, and the defendant applied for passports approximately 20 years ago, the passports have since expired, and she is unable to locate them. Mrs. Bloyed advised the only travel she is aware of the defendant taking outside the country was with her to Canada approximately 20 years ago.

The report further provides that Mr. Bloyed receives $1,500 per month in social security disability benefits. His wife informed probation that Mr. Bloyed suffers from numerous chronic medical issues and that that he "is on a psychiatric disability but has no mental health diagnoses."

## II. Northern District of Texas Hearing Testimony

*Alleged Offense*

The Government presented testimony from Special Agent Angelo DeFeo of the FBI Nashville Field Office. Agent DeFeo testified that he swore out the affidavit in support of Mr. Bloyed's criminal complaint. He testified that, in July 2024, an anti-Semitic hate group calling itself the Goyim Defense League conducted an event it called the Name the Nose Tour 6 in which members from all over the country came to Nashville to stage protests, harass people outside of synagogues, and cause disruptions in city council meetings. During an incident where members of the group marched down Broadway while carrying Nazi flags, doing Heil Hitler salutes, and made racially derogatory comments to people, a bartender from Johnny Cash's Bar & Grill had an altercation with one of the GDL members. The bartender was charged with assault and the GDL member was charged with aggravated assault with a deadly weapon. The cases were prosecuted by the Davidson County District Attorney's Office.

Agent DeFeo testified that several GDL members made posts on the Telegram and Gab social media websites expressing outrage that the GDL member was treated too harshly and that the bartender was treated too leniently. Mr. Bloyed made posts

4

on those websites under the username Schwetty Balls in which he commented on the Nashville incident, expressed support for the GDL member being prosecuted, used racial epithets to describe the bartender, and made various anti-Semitic statements. Agent DeFeo testified that, in these posts, Mr. Bloyed "t[ook] steps to actually promote the harassment of certain individuals." This included a posted of a Google shot of the bartender's father's home and a successive post stating, "Hey Nashville ZOG faggots, you might find [redacted] if you check his dads house...."[1] The Government also introduced a post encouraging people to contact the Johnny Cash Bar & Grill and "[s]end a carefully worded comment about how bad it could be to have that violent nut working there, and how someone might do something stupid to their bar and museum for employing him...."

The Government introduced the following posts, which are the basis for the charge in this case:

---

[1] The Anti-Defamation League defines the term "ZOG" as "a white supremacist acronym for 'Zionist Occupied Government,' which reflects the common white supremacist belief that the U.S. government is controlled by Jews. https://www.adl.org/resources/hate-symbol/zog





Agent DeFeo testified that the term "Rope list" "refers to the Day of the Rope, which is utilized in the book *The Turner Diaries*, in which neo-Nazi white supremacists are attempting to overthrow the U.S. government, and on the Day of the Rope, they conduct what's called – what we consider to be mass lynchings of race traitors."

6

Agent DeFeo testified that Mr. Bloyed was arrested in connection with this case at his home in Frost, Texas, where he lives with his wife, son, and 85-year-old father. The Government introduced a video recording from inside of the police car as Mr. Bloyed was transported to jail. In the video, Mr. Bloyed uses racial epithets, claims that the police are controlled by Jews, and makes various anti-Semitic comments. Agent DeFeo also testified there was no evidence that Mr. Bloyed had been present in Nashville at the time of the incident.

*Incident at Police Department*

In addition to Agent DeFeo's testimony about the charged offense, the Government presented testimony from Ernest Calvillo, Chief of Police for the City of Frost Police Department in Frost, Texas. Chief Calvillo testified that, in May 2023, he was sitting at his desk and saw Mr. Bloyed putting flyers on patrol vehicles and city employees' vehicles. He pulled the flyers off the patrol vehicles and saw that they were "racial" and "talking about Jewish people." He then noticed a different kind of flyer on his own personal vehicle. Chief Calvillo, who was not in uniform, asked Mr. Bloyed what he was doing, and Mr. Bloyed responded that he was distributing flyers and that this was a freedom of speech issue. As Chief Calvillo reached to remove a flyer from his vehicle, Mr. Bloyed grabbed his wrist. Chief Calvillo then "went into cop mode," swept Mr. Bloyed's leg, and they both went to the ground. In the process, he broke Mr. Bloyed's leg. Mr. Bloyed was upset and in pain. Chief Calvillo testified that Mr. Bloyed was upset and in pain. He testified, "He did tell me that if I didn't have my badge and gun on, he'd show me pain."

*Gun Show Incident*

The Government also presented testimony from Lt. Derrick Young of the Waxahachie Police Department in Waxahachie, Texas. Lt. Young testified that, in November 2023, he encountered Mr. Bloyed at a gun show at the Waxahachie Civic Center. Mr. Bloyed was handing out flyers with anti-Jewish material and was making people uncomfortable. When Lt. Young arrived, Mr. Bloyed was talking to two other officers. Mr. Bloyed was armed with a pistol. He refused to leave, saying that it was his right to be there and pass out flyers and that it shouldn't matter if anyone was offended. After Lt. Young explained that, if he didn't leave, he would be arrested for criminal trespass and his firearm would be seized, Mr. Bloyed left.

Mr. Bloyed later called the police station and asked what Lt. Young's nationality was. He also made a post to the Gab social medial website in which he complained about how the police had forced him to leave the gun show. He wrote, "We have two choices in how to deal with the clowns in the near future. Retraining or rope. I would let two of them go for retraining. The other, Lt. Young, goes halfway to the Turner rope lift and gets one more shot at being worth saving." He also wrote, "Lt. Young – Halfway to the rope, you've got one more chance [N-word]." Lt. Young testified that he is black and the other two officers involved were white.

*Defense Proffer*

Mr. Bloyed's defense attorney proffered that Mr. Bloyed's wife Rebecca was in the courtroom for the hearing and had also been present at the initial appearance. Defense counsel confirmed Ms. Bloyed's willingness to act as a third-party custodian.

8

## Argument

Mr. Bloyed asks the Court to revoke the order of detention entered in the Northern District of Texas. After a person is ordered detained by a magistrate judge, the person "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). "Review of the Magistrate Judge's decision is de novo, although the district court may conduct its review and base its decision on the evidence presented to the magistrate judge at the detention hearing." *United States v. Busbin*, No. 3:23-CR-00182, 2024 WL 1313880, *5 (M.D. Tenn. Mar. 27, 2024) (internal quotations omitted).

Under the Bail Reform Act of 1984, the Government may move for pretrial detention of a defendant when the defendant is charged with a "crime of violence." 18. U.S.C. § 3142(f)(1)(A). Communicating a threat in violation of 18 U.S.C. § 875(c) constitutes a "crime of violence" for purposes of the Bail Reform Act. *United States v. Cooper*, No. 3:19-MJ-04254-1, 2019 WL 4259454, *3 (M.D. Tenn. Sept. 9, 2019). *See also* 18 U.S.C. § 3156(a)(4).

There is no presumption of detention in this case. Although the Bail Reform Act interposes a rebuttable statutory presumption in favor of detention under certain circumstances, none of those circumstances apply here. *See* 18 U.S.C. § 3142(e). To support its request for detention, the Government must prove either (1) by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community; or (2) by a preponderance

9

of the evidence that no condition or combination of conditions will reasonably assure Mr. Bloyed's appearance as required. *See* 18 U.S.C. § 3142(f)(2)(B).

Mr. Bloyed does not present a risk of nonappearance. Although, in its motion for detention, the Government cited serious risk of flight as a reason the case is eligible for detention and asserted that no conditions of release could reasonably assure Mr. Bloyed's appearance as required, it offered no evidence that Mr. Bloyed presented a risk of flight or nonappearance. The magistrate judge correctly found that the Government had not shown by a preponderance of the evidence that Mr. Bloyed was likely to flee or not appear in court.

Furthermore, there is not clear and convincing evidence that no condition or combination of conditions would reasonably assure the safety of any other person and the community. Under § 3142(g), the Court must consider (1) the nature and circumstances of the offense charged (including whether the offense is a "crime of violence"); (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Regarding the nature and circumstances of the offense charged, Mr. Bloyed submits that the content and context of the post suggests it was protected political hyperbole and not a serious expression of intent to inflict injury. *See Watts v. United States*, 394 U.S. 705, 708 (1969). Additionally, the fact that a § 875(c) violation constitutes a "crime of violence" has less weight than it would if the offense involved actual violence as opposed to the mere threat of violence. Mr. Bloyed disputes that

the "Getting the rope" post constitutes a true threat, but even if it did, he made no effort to follow through on it. Lack of intent or ability to follow through on a threat is not a bar to a § 875(c) conviction, *United States v. Houston*, 683 Fed.Appx. 434, 439 (6th Cir. 2017), but it is relevant to whether release conditions can reasonably assure public safety for the purposes of § 3142(f)(2)(B).

The weight of the evidence factor also weighs in favor of release. This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt.[2] *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). At the September 25 hearing, the Government presented testimony, summarized above, from two Texas police officers about incidents that occurred while Mr. Bloyed was distributing anti-Semitic flyers. Neither of these incidents demonstrate that Mr. Bloyed is a danger to the community. During the incident at the City of Frost Police Department, Mr. Bloyed allegedly grabbed Chief Calvillo's wrist in an effort to stop him from removing a flyer from a car windshield. Chief Calvillo then broke Mr.

---

[2] To the degree the Court sees the weight of the evidence of guilt as a relevant consideration on the detention issue, the Government must prove: (A) that Mr. Bloyed knowingly transmitted a communication; (B) that the communication contained a threat to injure General Funk; (C) that Mr. Bloyed transmitted the communication either for the purpose of making a threat or knowing that the communication would be viewed as a threat; and (D) that the communication was transmitted in interstate commerce. *See* Pattern Crim. Jury Instr. 6th Cir. 18.01(1) (2023). *See also United States v. Doggart*, 906 F.3d 506, 510 (6th Cir. 2019), *citing Elonis v. United States*, 575 U.S. 723, 740 (2015). The threat must be a serious expression of intent to inflict bodily harm on General Funk that a reasonable observer would perceive to be an authentic threat. *See* Pattern Crim. Jury Instr. 6th Cir. 18.01(2)(A). Although the Government can prove Mr. Bloyed transmitted the "Getting the rope" post in interstate commerce, the *mens rea* issue is a difficult, complex question for the jury that creates a real possibility of acquittal at trial.

11

Bloyed's leg. The alleged wrist grabbing is not evidence of dangerousness justifying pretrial detention. While on the ground, Mr. Bloyed allegedly said that, if Chief Calvillo didn't have a badge and a gun, Mr. Bloyed would 'show him pain.' This was not an authentic threat of violence and is not evidence of dangerousness. During the gun show incident, Mr. Bloyed did not behave violently or threaten anyone. The subsequent post about Lt. Young, while ugly, does not constitute a true threat of violence.

Regarding the third § 3142(g) factor, the history and characteristics of the person, Mr. Bloyed's only prior criminal history is a trespass charge. There is no evidence he has ever engaged in any actual violence towards anyone. He has never previously been to Nashville and was not present for the GDL 'protests' in July. He is a 59-year-old man who receives disability benefits and lives with his wife, teenage son, and elderly father. This factor clearly weighs in favor of release.

Regarding the nature and seriousness of the danger posed by Mr. Bloyed's release, Mr. Bloyed maintains that his release would not pose a danger to anyone and that this factor, like the first factor, will always have less weight in a case where the offense is based on speech and there is no evidence of an intent to follow through on the purported threat.

Mr. Bloyed respectfully submits that the magistrate judge erred in finding that no condition or combination of conditions would reasonably assure the safety of any other person and the community. He further submits that the U.S. Probation Office's

recommendation that he be released on conditions was appropriate and should be accepted by this Court. The conditions recommended in the pretrial services report

## Conclusion

For the reasons stated above, Mr. Bloyed asks the Court to grant him a prompt hearing on this motion and, after consideration of the facts, release him pending trial.

Respectfully submitted,

/s/ *Will Allensworth*
WILL ALLENSWORTH (BPR# 030735)
Assistant Federal Public Defender
Office of the Federal Public Defender
810 Broadway, Suite 200
Nashville, TN  37203
615-736-5047
Will_Allensworth@fd.org
Attorney for David Aaron Bloyed

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2024, I electronically filed the foregoing Motion to Revoke Order of Detention with the U.S. District Court Clerk by using the CM/ECF system, which will send a Notice of Electronic Filing to the following: Joshua Kurtzman, Assistant United States Attorneys, 719 Church Street, Suite 3300, Nashville, Tennessee, 37203.

/s/ *Will Allensworth*
WILL ALLENSWORTH